[No. 21227. Department One. June 12, 1930.]

F. M. BENSON, *Respondent*, v. C. V. SAVIDGE, *Appellant*.[1]

*The Attorney General* and *Chas. O. Flint,* for appellant.

TOLMAN, J.—Respondent, as plaintiff, brought this action to enjoin the defendant, as state land commissioner, from forfeiting a mining lease issued to him under date of January 18, 1914. Issues were framed and the cause tried on the merits, resulting in a judgment permanently enjoining the land commissioner from forfeiting the respondent's lease for any cause which had occurred or existed prior to the entry of

[1] Reported in 288 Pac. 1060.

the final judgment. The commissioner has appealed. The respondent has made no appearance in this court, and we are without the aid of any brief or argument in his behalf.

It appears that respondent, many years ago, in prospecting for precious metals, discovered, along the banks of Mineral creek in Lewis county, certain outcroppings of rock thought to bear lime and silica, and, about the year 1900, he began there to do prospect work.

Just when he discovered that the land upon which this outcropping appeared belonged to the state, is not shown by the record, but, apparently, on January 18, 1912, he procured to be issued to him by the state land department a temporary mining lease good for a period not to exceed two years under the terms of chapter 102, Laws of 1897, p. 293, and the amendatory acts, chapter 147, Laws of 1899, p. 337, and chapter 151, Laws of 1901, p. 313. In due time, respondent made application for a thirty-year mining lease covering the same property, and on January 18, 1914, the present lease granting a thirty-year term was issued to him.

Since the execution of this lease, respondent has continued prospecting the ground, apparently with reasonable faithfulness. He has made numerous open cuts and prospect holes, having, in the thirty years since he first entered upon the property, expended thereon time and labor which one of his witnesses estimated to be worth $10,000. Respondent testified that the known mineral contents of the land consist of rock bearing lime and silica exposed in large quantities in the bare abrupt walls of the deep canyon of the creek passing through the land, but he gives no information as to the quality of this rock, save that he says it is

suitable for cement-making purposes; but whether it is desirable so as to justify a use under difficult conditions, or otherwise, the record is entirely silent.

The property is at least two miles from any road, is reached by a trail which can only be traversed by one on foot, and respondent has, for many years, carried his supplies in on his back, and freely admits that, if any commercial product was now mined, it would have to be carried out on men's backs in order to reach a market. Manifestly, mineral of this character in such a situation is wholly worthless, and only by a change of conditions can it become merchantable or valuable. Indeed, respondent seems to cheerfully admit that, in order to actually mine the property and take out and sell the product, a railroad or a good wagon road would have to be built to the property, a cement mill be there erected and large sums spent in opening up, installing machinery, and in equipment generally. No move has been made in the direction of accomplishing any of these things since the lease was issued, and respondent also cheerfully admits that he is wholly without financial resources sufficient to accomplish any of these purposes, and, with the usual faith of the prospector, seems to be hanging on in the hope that some powerful interest with unlimited finances will discover the property and purchase it or develop it for an interest.

Do these things show a compliance with the terms of the lease? Respondent paid a fee of ten dollars when the lease was issued to him, and the only other consideration moving to the state is a royalty upon gross output. The lease provides:

". . . and the further payment by the party of the second part to the party of the first part, on the first day of each calendar month for the full term of this lease, of an amount which shall be equivalent to five per cent (5%) of the value of the gross output of

valuable minerals or precious metals mined upon and removed from the premises above described,''

The purpose for which the property is leased is stated to be:

''. . . for the purpose of exploring for, mining, taking out and removing therefrom the merchantable shipping ore containing gold, silver, copper, lead, cinnebar, fire-clay, talc and other minerals which are or which hereafter may be found on, in or under said land, together with the right to construct all buildings, make all excavations, openings, ditches, drains, railroads, wagon roads, smelters and other improvements upon said premises which are or may become necessary or suitable for the mining or removal of ore containing gold, silver, copper, lead, cinnebar, fire-clay, talc or other minerals from the premises, with the right, during the existence of this lease, to cut and use the timber found on said premises for fuel and, so far as may be necessary, for the construction of buildings required in the operation of any mine or mines on the premises hereby leased, as also the timber necessary for drains, tramways and supports for such mine or mines;''

Other provisions of the lease indicate rather clearly that the actual mining and shipping of mineral was intended, and that mere prospecting is by no means a compliance with its terms.

The lease contains a paragraph providing for forfeiture in words as follows:

''PROVIDED, However, that the state of Washington, by and through the commissioner of public lands, or other authorized official, reserves the right to terminate this contract and to cancel the same for any breach of the terms and conditions thereof on the part of the party of the second part or for any failure to prosecute diligently and in good faith the mining of the lands covered by this contract or to comply with the terms and conditions thereof in such manner as may be authorized by law; and, in the absence of positive provisions of law, then in the same manner and

upon the same notice as may be required by law for the cancellation of leases of agricultural state lands: . . ."

The statute law, in force at the time and under which these leases were issued, seems to contemplate a temporary or prospecting lease for a two-year period only and not renewable. Under such a temporary lease, mineral can be removed only in small quantities for testing purposes, and none can be sold or used commercially. At the expiration of the temporary lease, the only right in the lessee is to procure a thirty-year mining lease, and, while there may be incidental prospecting thereunder, yet the manifest intention is that actual mining shall be diligently prosecuted, to the end that the state shall receive an income.

Surely the state, for the small consideration of ten dollars, should not be expected to tie up eighty acres of its land for the long term of thirty years with the possibility of it being stripped of all of its timber. The conditions written into the lease and accepted by the respondent clearly indicate that no such purpose was intended, since the lease plainly calls for mining and removal of mineral, so that the state may receive its reserved royalty; and, since the right to cancel or forfeit for failure to mine diligently and in good faith is one of the terms specifically agreed upon, we are constrained to hold that the land commissioner should not have been enjoined from proceeding regularly to forfeit the lease.

The judgment is reversed with directions to dismiss the action.

MITCHELL, C. J., MAIN, BEALS, and MILLARD, JJ., concur.